UNITED STATES v. ANDERSON. See Case No. 14,672.

## Case No. 14,453.

### UNITED STATES v. ANDREWS.

[Cited in U. S. v. Abbott, Case No. 14,416. Nowhere reported: opinion not now accessible.]

## Case No. 14,454.

### UNITED STATES v. ANDREWS.

[1 Brunner, Col. Cas. 422; [1] 5 City H. Rec. 120.]

Circuit Court, S. D. New York. Sept. 15, 1820.

SLAVERY—ENGAGING IN SLAVE TRADE.

It is sufficient on an indictment for engaging in slave trade, to prove that the accused were engaged in procuring slaves, and sending them on by another vessel; it is not necessary that the vessel to which they belong should actually have had slaves on board.

The defendant [Alexander McKim Andrews] was indicted under the second section of an act of congress, passed the 10th of May, 1800 [2 Stat. 70], which is in these words: "It shall be unlawful for any citizen of the United States, or other person residing therein, to serve on board any ves-

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Albert Brunner, Esq., and here reprinted by permission.]

sel of the United States, employed or made use of in the transportation or carrying of slaves from one foreign country or place to another; and any such citizen or other person, voluntarily serving as aforesaid, shall be liable to be indicted therefor; and on conviction thereof, shall be liable to a fine not exceeding two thousand dollars, and be imprisoned not exceeding two years." Gord. Dig. 421. · The indictment, which contained several counts, alleged, that the prisoner, late of the city of Baltimore, mariner, and a citizen of the United States, on the 1st day of April, 1820, on the high seas, near a place called Cape Mount, on the coast of Africa, to wit, also at New York, and within the jurisdiction, etc., did, voluntarily, unlawfully, serve on board a vessel of the United States, being a schooner called the Endymion, belonging to a citizen of the United States, to the jurors unknown, employed in the transportation of slaves, from one foreign country to the jurors unknown, to some other foreign country also to the jurors unknown, against the peace and the form of the statute, etc.

Mr. Tillotson, Dist. Atty., and Mr. Bunner, for the prosecution.

Emmet & Scott, for the prisoner.

It appeared, from the testimony of Silas H. Stringham, that being attached to the Cyane sloop of war, a ship of the United States, in the capacity of lieutenant, on the 6th of April last, he boarded the Endymion, commanded by the defendant, · at Cape Mount, on the coast of Africa. He found on board an American register and other papers, which he received from the mate of the vessel, in the absence of the defendant. The vessel had a berth deck, a large quantity of water, two large cabooses, and provisions, but no cargo; and the witness found in the hold a quantity of hand-cuffs. She had every appearance of a vessel engaged in the slave trade, with the equipment of which the witness was well acquainted.

Mr. Tillotson inquired of the witness, whether the defendant did not admit that he had sent slaves from the coast of Africa by another vessel.

The counsel for the defendant objected to the inquiry, and to the further prosecution of this indictment, under the evidence produced. They argued, in the first place, that the statute upon which the indictment was founded, was enacted to prohibit seamen from serving on board vessels employed in the transportation of slaves, and did not extend to the captain, inasmuch as he could not be said to serve on board any vessel, but to command others. In the second place it was insisted, that in order to constitute the offense against which the statute was enacted, it was necessary that the vessel should have been actually employed and made use of in the transportation of slaves; they should have been on board, and, to

bring the defendant within the statute, the act should have been consummated previous to the capture.

The judge said that he had no doubt as to the first point raised by the counsel. The captain may as well be considered as serving on board as any of the crew. They all are serving on board under their owner or owners. With regard to the second, he thought it a grave objection, and worthy of consideration.

The counsel for the prosecution argued that the construction of the act contended for by the opposite counsel would render its provisions nugatory. By an act of 1819 [3 Stat. 532] our cruisers are authorized to seize vessels engaged in the slave trade on the coast of Africa. This act is declaratory of that upon which this prosecution is founded. If it was necessary that the slaves should be on board, that they should be transported, and that the act of transportation should be complete before the vessels could be seized, then these acts destroy themselves. The words of the act are "employed or made use of in the transportation of slaves." The word "employed" is of the same import as "engaged"; and if the vessel was engaged in any one act appertaining to the transportation of slaves, the defendant is brought within the act, and amenable to its penalties. The word "in," preceding the words "the transportation," etc., is synonymous with "for the purpose," and any inceptive act of transportation on the part of the captain or crew is sufficient.

It was insisted by the counsel for the defendant, in reply, that the word "employed" imported being actually engaged in the transportation, and the phrase "made use of" meant the completion of the act of transporting. To constitute the offense both must concur. The statute gave a locus penitentiæ, a time for repentance, before the offense of transportation was consummated.

The judge decided that if the crew of the Endymion, while she was on the coast of Africa, was engaged in procuring slaves and putting them on board any other vessel, for the purpose of transporting them to any other place, that, in his opinion, the captain and crew were amenable to the penalties of the statute, though no slaves were ever put on board the Endymion. In this point of view the testimony is admissible.

The witness proceeded to state that when he took possession of the Endymion, the defendant admitted that she was a lawful prize to the first officer of the Cyane; that he further admitted, on the passage, and after his arrival here, that he had sent home by another vessel one hundred and fifty; that he had made enough by those he had sent home to clear the owners from the loss of the vessel; and that had he not been taken, he would have cleared two hundred thousand dollars. His wages, he admitted, were two hundred dollars a month, and

those of the crew forty dollars; whereas, so the witness stated, the usual wages on board merchant vessels is but fifteen dollars a month.

It was testified to by Dr. Wiley, that after the arrival of the prisoner here, he admitted, that he had made about fifteen thousand dollars, was willing to give any lawyer two thousand dollars who would free him from his embarrassment; and that he had been inadvertently drawn into the affair at a dinner party at Baltimore.

The prosecution having rested, testimony was introduced on the part of the defendant for the purpose of showing that the Endymion was engaged in getting ivory and gold dust, and at no time had any slaves on board.

The judge said there was no proof in the case that any slaves were ever put on board; and he therefore deemed the inquiry a waste of time.

The case was summed up by respective counsel; and the several points of law, as above stated, were urged to the jury.

The judge, in his charge to the jury, instructed them that if this vessel had been fitted out for any other purpose than the transportation of slaves, it would have been in the power of the defendant to have shown it; that in the absence of all testimony on this point, the inference was strong against him; and that if they believed that the defendant and his crew had any agency, or were concerned in procuring slaves on the coast of Africa, and transporting them on board any other vessel, he came within the act, and it would be their duty to convict him.

It being late in the afternoon, the jury were directed by the judge to seal their verdict, and bring it into court in the morning. At this time eleven of the jurors returned into court, and it being proved to the court that one of them on his way to the court had fallen down in a fit, and that the state of his mind was such as to render him incapable of a discreet exercise of his duty on being polled, the court ordered the jury to be discharged, and the prisoner to be remanded for trial.